IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

JUNKER V. CARLSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DEBRA J. JUNKER ET AL., APPELLANTS,
V.
ELWYN CARLSON ET AL., APPELLEES.

Filed December 10, 2013.    No. A-12-650.

Appeal from the District Court for Kearney County: STEPHEN R. ILLINGWORTH, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

George G. Vinton for appellants.

Steve Windrum for appellees Elwyn Carlson and Joel Carlson.

Donald J. Pepperl, P.C., L.L.O., for appellee SLS Partners.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

MOORE, Judge.

INTRODUCTION

Debra J. Junker, Lynn P. Carlson, Dale E. Carlson, and Carol A. Carlson filed suit in the district court for Kearney County against Paul Maruska, Roger Wells and his wife, Elwyn Carlson, Joel Carlson, and SLS Partners (SLS), a Nebraska general partnership. Underlying the suit are the allegations that Wells, as trustee, breached his fiduciary duties and exceeded his authority as trustee with respect to certain trust property. Wells, his wife, and Maruska were dismissed as parties and are not involved in this appeal. As pertinent to this appeal, the suit sought to impose constructive trusts for the return of money Joel and Elwyn received for the release of a particular lease and for the return of profits SLS received in its dealings with Wells regarding certain trust property. The district court granted the motions for summary judgment filed by SLS and by Joel and Elwyn and entered judgment in their favor. Junker, Lynn, Dale, and Carol (collectively the Appellants) appeal, asserting that the district court erred in granting summary judgment against them and in failing to grant their summary judgment motions instead.

- 1 -

Because we conclude that genuine issues of material fact exist regarding certain claims and defenses, we reverse the entry of summary judgment against the Appellants and remand the cause for further proceedings. For the same reason, we affirm the denial of summary judgment in favor of the Appellants.

BACKGROUND

*Transactions Relating to*
*Carlson Property.*

In 1997, Dale and Carol, husband and wife, conveyed certain real estate (Tract 1 and Tract 2) to a trust known as Mill Creek Trust Company (Mill Creek), in the first of a lengthy series of transactions involving the property. They named Maruska as trustee of Mill Creek. Maruska, to quote the district court's summation of the evidence about him, was an individual who "extoll[ed] the virtues of setting up [t]rusts to avoid taxation and creditors." The beneficiaries of Mill Creek were Dale and Carol's children, namely; Junker, Lynn, and Michael Carlson. We note that there is no clear explanation in the record as to why Michael is not a party to this suit. Dale and Carol's children never received any benefits from Mill Creek or any of the subsequent trusts into which the property was conveyed. Dale and Carol received benefit to the extent that, after the conveyance to Mill Creek, they resided rent-free in the residence located on Tract 1 and continued to do so until the latter part of 2006.

Sometime after the formation of Mill Creek, Dale was sued in Dawson County District Court by the estate of Hugh Ralston for rent Dale owed on land from which he harvested prairie hay, and a default judgment of $35,000 was entered against him. The Ralston estate thereafter filed a fraudulent conveyance action against Maruska and Mill Creek in the Dawson County District Court. The Ralston estate sought to set aside the conveyance of Tract 1 and Tract 2 to Mill Creek and subsequent grantees so that it could collect the default judgment entered against Dale. Wells executed a variety of instruments, including mortgages, construction liens, and Uniform Commercial Code financing statements and recorded these instruments against Tract 1 and Tract 2, in an effort to block the Ralston estate's efforts to collect the judgment against Dale.

On May 2, 2001, Maruska, as trustee of Mill Creek, conveyed both tracts to a trust called Picibo Company, of which Wells was the named trustee. The two tracts were conveyed by quitclaim deeds. No consideration was paid for the transfer. On May 16, Wells, as trustee of Picibo Company, conveyed both tracts to Aebeskiver Company Trust (Aebeskiver), again for no consideration. Wells was also trustee for Aebeskiver. The named beneficiary of this trust was Greater Earth Wisdoms, although Wells admits that Dale and Carol's children were the intended beneficiaries. Wells testified in his deposition that Greater Earth Wisdoms was a "501(c)3 corporation" for "alternative health things" that "never did get off the ground."

In December 2001, Wells, as trustee of Aebeskiver, leased the farm ground in Tract 1 to Joel and Elwyn for $160 per acre for a total of $23,408 per year. The lease commenced on March 1, 2001, and was to terminate on the last day of February 2007. Dale helped negotiate the lease to Joel and Elwyn. Very little of the rent provided for in this lease was ever remitted to the Appellants. An accounting of this rent was never provided by Maruska or Wells.

On January 13, 2004, Wells, as trustee of Aebeskiver, sold Tract 1 to SLS for a purchase price of $200,000. SLS is a business partnership composed of Regan Scow, Gerald Lucky, and

Gary Stallcup. SLS deals with individuals and entities that cannot obtain money through normal banking channels because of their financial history. Because of the nature of its clientele, SLS' goal is to obtain an 18- to 20-percent return on the business deals it makes.

In addition to providing for the sale of Tract 1, the agreement between Aebeskiver and SLS included two additional relevant provisions. First, SLS leased Tract 1 back to Wells as trustee of Aebeskiver, for an annual rent of $21,000 plus payment of real estate taxes in the amount of $5,405.80. The lease was to terminate on the last day of February 2007. The lease-back provision of the agreement between Aebeskiver and SLS references Aebeskiver's "long time year to year lease with [Joel and Elwyn] on the land described herein" and states that the agreement between Aebeskiver and SLS "shall be subject to these leases." Second, the sale agreement included a provision giving Aebeskiver the option to repurchase Tract 1 from SLS prior to December 31, 2007. The repurchase price escalated as follows: $231,000 on or before December 31, 2004; $252,000 on or before December 31, 2005; $273,000 on or before December 31, 2006; and $294,000 on or before December 31, 2007.

From the proceeds of the sale of Tract 1 to SLS, the Ralston estate was paid its judgment and the encumbrances executed in 2002 were released. The balance of the proceeds from the sale to SLS of $153,394.85 was paid to Wells as trustee of Aebeskiver. Wells never provided the balance of the proceeds to the Appellants or properly accounted for it, and it was apparently lost when Wells invested in an entity called Konza Financial.

On July 28, 2004, Wells, as trustee of Aebeskiver, entered into an agricultural lease amendment with Joel and Elwyn, which extended the end date of the original lease of the farm ground on Tract 1 to Joel and Elwyn from February 2007 to February 2014.

A final series of relevant transactions occurred on January 31, 2007. On that date, Aebeskiver repurchased Tract 1 from SLS for $294,000 and simultaneously sold Tract 1 to Jeremy and Tricia Sitorius for $515,000. Also, Joel and Elwyn released their lease of the farm ground on Tract 1 and were paid $152,000 for their release. After the payment to SLS, payment to Joel and Elwyn, and payment of closing costs, Aebeskiver netted $64,047.75. After the closing, Wells, as trustee of Aebeskiver, wired that money to Texas for an investment on a medical device. All of the money was lost and further unaccounted for by Wells.

Additional facts will be discussed in the analysis section below as necessary to the resolution of the appeal.

*Procedural Background.*

The Appellants filed their initial complaint in equity in the district court on December 13, 2007. They filed their operative complaint on May 6, 2009. The basis of the suit is the underlying allegations of fraudulent action by Wells and his exceeding his authority as trustee as it relates to the trust property. In their operative complaint, the Appellants sought the return of the $152,000 that Joel and Elwyn received for the release of their lease of the farm ground on Tract 1 and the return of $153,700 from SLS for its profit from the transactions with Wells. The Appellants sought to recover from SLS and Joel and Elwyn on the basis that they knew or should have known Wells was committing fraud and acting in bad faith, and therefore, the Appellants claim that a constructive trust should be imposed and the money returned. The Appellants also alleged that SLS made an exorbitant rate of return on its investment and that Joel and Elwyn did

not give adequate consideration for an extension of the lease. The Appellants also set forth claims against Maruska, Wells, and Wells' wife, but we do not discuss those claims as they are not relevant to our resolution of this appeal and those individuals have been dismissed as parties.

During the course of the proceedings in this case, Junker, Lynn, Dale, and Carol obtained a nondischargeable judgment in the U.S. Bankruptcy Court for the District of Nebraska against Wells for his fraud in the handling of Aebeskiver in the amount of $645,583.64 plus costs and postjudgment interest. As of the time of the district court's decision in this case, the bankruptcy judgment had not been satisfied.

The Appellants, Joel and Elwyn, and SLS all filed motions for summary judgment, which were heard by the district court on December 8, 2010. The court received numerous exhibits, heard argument, and took the matter under advisement.

On September 19, 2011, the district court entered an order overruling the Appellants' motion for summary judgment against SLS and Joel and Elwyn. The court granted summary judgments in favor of SLS and Joel and Elwyn against the Appellants. The court also made certain findings regarding Dale and his knowledge of, and participation in, the various transactions, including a finding that he was precluded from recovery under the doctrine of unclean hands. We discuss the court's findings of fact and conclusions of law further in the analysis section below.

The Appellants filed various postjudgment motions, including a motion to alter or amend and motion for new trial. Following a hearing on the pending motions, the district court entered an order on December 23, 2011, overruling the Appellants' motion to alter or amend and motion for new trial. The court denied their motion to enter judgment against Wells in this case "concurrent with" the bankruptcy judgment against him, finding it unnecessary to enter such a judgment in this case. In a separate order entered on the same date, the court found that Maruska was deceased and granted the motion to dismiss him as a defendant. The court also granted the motion to dismiss Wells' wife as a defendant. Finally, the court granted the Appellants' motion regarding Tract 2 of the real estate at issue in this case, removing Wells as trustee of Aebeskiver and naming Junker the new trustee with authority to convey Tract 2 to a trust for the benefit of herself, Lynn, and Michael.

The Appellants appealed in case No. A-12-044 from the denial of their motion to alter or amend and motion for new trial, which this court dismissed on March 1, 2012, for lack of jurisdiction due to the remaining outstanding claims against Wells. After entry of our mandate in the first appeal, the Appellants filed a motion to dismiss Wells, alleging that because the bankruptcy judgment obtained against Wells was for the same damages alleged in this case, there was no need to proceed further against Wells. The district court granted the Appellants' motion on June 26, 2012, and they perfected the present appeal to this court.

## ASSIGNMENTS OF ERROR

The Appellants assert, consolidated and restated, that the district court erred by (1) granting summary judgment in favor of SLS and Joel and Elwyn and failing to grant summary judgment in favor of the Appellants and (2) making certain findings of fact about Dale.

STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Beveridge v. Savage*, 285 Neb. 991, 830 N.W.2d 482 (2013). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Durre v. Wilkinson Development*, 285 Neb. 880, 830 N.W.2d 72 (2013).

ANALYSIS

*Applicable Law.*

The appellants sought to impose a constructive trust against Joel and Elwyn for return of the $152,000 that Joel and Elwyn received for their release of the lease of the farm ground on Tract 1 and against SLS for the $153,700 in profits it made in its dealings with Wells. Essentially, they sought to impose liability on SLS and Joel and Elwyn for their participation in Wells' breach of trust. The district court found that the Appellants failed to establish the factual foundation to justify imposing a constructive trust by clear and convincing evidence against either SLS or Joel and Elwyn.

An action to impose a constructive trust sounds in equity. *Johnson v. Anderson*, 278 Neb. 500, 771 N.W.2d 565 (2009). A party seeking to have a constructive trust imposed has the burden to establish by clear and convincing evidence the factual foundation required for a constructive trust. *Id.* Regardless of the nature of the property upon which the constructive trust is imposed, a party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Eggleston v. Kovacich*, 274 Neb. 579, 742 N.W.2d 471 (2007).

The district court also applied Neb. Rev. Stat. § 30-38,101 (Reissue 2008), which is the Nebraska Uniform Trust Code provision concerning the protection of persons dealing with trustees, and found that SLS and Joel and Elwyn were protected parties under this statute. The court noted that the Nebraska Uniform Trust Code was passed in 2003, which was after the final transfer of Tract 1 and Tract 2 into Aebeskiver, but it found that the principles set forth in § 30-38,101 should apply to Wells' actions. We note that the code applies to all trusts created before, on, or after January 1, 2005, and to all judicial proceedings concerning trusts commenced on or after January 1, 2005. Neb. Rev. Stat. § 30-38,110(a) (Reissue 2008).

Section 30-38,101 provides:

(a) A person other than a beneficiary who in good faith assists a trustee, or who in good faith and for value deals with a trustee, without knowledge that the trustee is exceeding or improperly exercising the trustee's powers is protected from liability as if the trustee properly exercised the power.

(b) A person other than a beneficiary who in good faith deals with a trustee is not required to inquire into the extent of the trustee's powers or the propriety of their exercise.

(c) A person who in good faith delivers assets to a trustee need not ensure their proper application.

Below, we first consider whether summary judgment in favor of SLS was proper. We then consider the grant of summary judgment in favor of Joel and Elwyn, and finally, we address the district court's findings of fact about Dale.

*Summary Judgment in*
*Favor of SLS.*

The essence of the Appellants' claim against SLS is that it participated in Wells' breach with respect to the trust property. Specifically, the Appellants assert that SLS purchased Tract 1 for less than fair market value, entered into a lease for the property that lost about $3,000 a year, and entered into an agreement that required Wells to repurchase the property at an escalated price. The Appellants contend that SLS was acting in bad faith and had knowledge that Wells was improperly exercising his authority as trustee by engaging in the above deal. The Appellants sought recovery of the profit SLS realized in the purchase and resale of Tract 1.

In response, SLS contends that Dale was aware of and participated in the transaction relating to the SLS purchase of Tract 1 and that SLS therefore had no reason to question the authority of Wells to bind the trust. SLS further contends that the transaction was essentially a financing arrangement for an investment that in hindsight was unwise, but that SLS acted in good faith, gave value for the transaction, and should not be liable for the subsequent action of Wells.

In granting summary judgment in favor of SLS, the district court made the following factual findings:

> When the deal was made with SLS, [Dale] was fully aware of the structure of the deal. He claims that he thought it was a loan. Whether it was a loan or purchase he knew SLS was paying less than market value. It clearly appeared to representatives of SLS that [Wells] had fully informed [Dale] of the specifics of the deal.
> . . . .
> [Dale] claims he did not know the full extent of the deal [the sale of Tract 1 to SLS] but the evidence was clear that at the meeting at the farm where SLS['] partners were assessing the value of the deal he was generally aware of what was going on. [Wells] also assured SLS he would fill in the details with [Dale]. Under the [Nebraska Uniform Trust Code] SLS had no further obligation to inquire into [Wells'] authority to consummate the deal.

The court further found:

> SLS has no equitable duty to return their profits on this deal. SLS dealt in good faith with [Wells] who had the apparent authority and blessing of [Dale]. SLS did not fraudulently obtain a profit on this [deal]. The [Appellants] complain that SLS should be punished for making a good business deal, a novel theory that has no merit. [Aebeskiver]

had the option to buy back [Tract 1] and did so well under the fair market value as evidenced by the sale to [the Sitoriuses] for $515,000.

The Court concludes SLS dealt with [Wells and Dale] in good faith, had done due diligence under the circumstances to determine if [Wells] had authority and did not act fraudulently. The Court therefore concludes the Motion for Summary Judgment should be granted in favor of [SLS].

As is evident from the court's findings and conclusions above, it relied heavily on the knowledge and participation of Dale in the transaction between Wells and SLS regarding Tract 1. However, the evidence presented on this issue was in dispute. And the question before us is not whether the Appellants will ultimately prevail on their claim against SLS, but, rather, whether a genuine issue of material fact exists to prevent entry of summary judgment in favor of SLS. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute. *Young v. Govier & Milone*, 286 Neb. 224, 835 N.W.2d 684 (2013).

The record shows that SLS had previously purchased property from Wells. According to Scow, Wells needed some cash, and he apparently was unable to obtain money from a traditional banking institution. Wells' attorney contacted SLS to arrange the transaction. SLS has never entered into any transactions with Wells other than that transaction and the one at issue in this case, but prior to the transaction in this case, SLS and Wells' attorney had entered into about 10 purchase and repurchase agreements similar to the one at issue.

Scow testified that he was contacted by Wells' attorney about SLS' purchasing Tract 1. Scow, Scow's father, and Stallcup went to look at the property approximately a month or two before the contract was signed. Carol was on the property when they arrived and she showed them the house, but they did not have any discussions with her about purchasing the property. When Wells arrived, Wells, Scow, Scow's father, and Stallcup took a tour of the farm. Wells disclosed the amount of money he was seeking, who the tenants of the property were, and how much rent was being paid. After the tour, Dale joined them. Scow testified that he went over "the program" with Dale, that it was a short meeting, and that Dale thought the sale and lease-back with a repurchase option "was a great deal" because "they wanted the money, so they could do their project." Scow learned from Wells and Dale that they needed the money for investment on a medical device, that Dale was excited about the medical device, and that he wanted to see how fast the deal with SLS could be closed. Scow admitted, however, that he did not really know what Dale's involvement was at that time and that it was possible that Dale was not present during all of the conversations about the deal.

Joel indicated in an affidavit that he was present during a meeting in August 2003 or 2004 in which Wells and Dale indicated they were going to purchase shares in "Konza, Inc." by utilizing financing involving Tract 1. Joel stated that Wells and Dale also mentioned that they needed to pay a judgment to the Ralston estate.

Dale stated in his affidavit that he did not learn the property had been sold to SLS until he had contact with Internal Revenue Service investigators in 2006. Dale indicated that the meeting with Scow and Stallcup occurred when they were looking at the real estate in late 2003 and early 2004. Dale stated that he spoke briefly with Scow and Stallcup during this meeting but did not discuss any business or financial matters. Dale states that at one point, either Scow or Stallcup

asked Wells if the situation should be explained to Dale and then Wells replied that he would explain it to Dale later. Dale stated that he thought Wells was attempting to borrow money from SLS to pay off the Ralston estate.

Viewing the evidence in a light most favorable to the Appellants, as we must, we conclude that there is a genuine issue of material fact regarding the extent of Dale's knowledge of, and involvement in, the transaction between Wells and SLS, which in turn, impacts the question of whether SLS had knowledge that Wells was improperly exercising his authority as trustee by entering into the agreement to sell Tract 1. The district court erred in deciding the disputed facts in the context of a summary judgment proceeding.

*Summary Judgment in Favor*
*of Joel and Elwyn.*

The Appellants claim that Wells violated his duties as a trustee when he entered into the lease amendment with Joel and Elwyn in 2004 because Aebeskiver no longer owned the property and Wells had no authority to extend the lease. The Appellants also claim that Wells violated his duties by failing to seek greater rent in the extension. The Appellants claim that Joel and Elwyn had knowledge Wells was exceeding his authority because they knew Aebeskiver did not own the land at the time of the lease extension and that Joel and Elwyn knew the rent was too low. As such, the Appellants assert that Joel and Elwyn should not be allowed to retain the money paid to them to obtain the release of that lease upon the subsequent repurchase and sale of the property.

In granting summary judgment in favor of Joel and Elwyn, the district court found:

> The evidence is clear and convincing that [Joel and Elwyn] did not act fraudulently. It is clear and convincing that [Dale] was aware of everything except [Wells'] extension of the lease. He therefore claims they did not pay adequate consideration for extension of the lease and exacted an exorbitant amount for release of the lien. It should be noted that [Joel and Elwyn] and [Aebeskiver] were represented by attorneys which resulted in the settlement of the lease release. It should also be noted from the evidence that [Wells] as Trustee had the authority over the land over the years which was acknowledged by [Dale]. The evidence is clear that [Joel and Elwyn] acted in good faith, did not commit fraud, did not abuse an influential or confidential relationship and should not be punished for negotiating a good price for their release. There is ample evidence in the record to support that buy out figure for the number of years left on their lease. The Court therefore concludes Summary Judgment should be [g]ranted in favor of [Joel and Elwyn].

The issue in connection with the claim against Joel and Elwyn is whether they were aware, at the time of the lease extension, that Aebeskiver did not own the property, that the property had been sold to SLS, and that Wells no longer had authority to execute the lease extension. The district court did not specifically address this issue in its findings and conclusions. Our review of the record shows that there exists a dispute in the evidence, which, when viewing the evidence in the light most favorable to the Appellants, rises to a genuine issue of material fact.

Wells testified that he told Joel and Elwyn that Tract 1 had been sold to SLS at the time of the sale in January 2004. The lease amendment and extension occurred in July 2004. Both Joel

and Elwyn state in their affidavits that Wells never told them he did not have authority to enter into the lease amendment. Joel and Elwyn stated in their affidavits that they did not learn that Wells, as trustee of Aebeskiver, might no longer be the owner of Tract 1 until approximately October 2004 when Elwyn contacted the Dawson County Agricultural Stabilization and Conservation Service office to sign the land up for the coming year's government program.

Other documents in the record suggest that Joel and Elwyn knew that SLS was the owner of the land prior to the lease extension, including a water-well permit application signed by Elwyn in May 2004 and a bill for drilling an irrigation well in June 2004.

The district court erred in deciding issues of disputed fact and in granting summary judgment in favor of Joel and Elwyn given the existence of a genuine issue of material fact. See *Young v. Govier & Milone*, 286 Neb. 224, 835 N.W.2d 684 (2013).

*Findings of Fact About Dale.*

The Appellants assert that the district court erred in making certain findings of fact about Dale. As discussed above, the court made several findings about the knowledge of Dale with regard to Wells' transactions concerning the trust property which relates, in part, to Wells' authority to enter into the transactions. We have already concluded that the evidence regarding Dale's knowledge was in dispute and created a genuine issue of material fact precluding entry of summary judgment in favor of SLS.

The district court went on to make findings under a heading entitled "Unclean Hands." In its answer to the Appellants' complaint, SLS asserts as an affirmative defense that the Appellants' claims are barred by the doctrine of unclean hands. In Joel and Elwyn's answer, they allege that the Appellants' engaged in fraud by and through Dale, that they entrusted Dale as their agent, that Dale knew or should have known the nature of the transactions he was dealing with, and that Dale was an active participant in the creation of the trusts.

Specifically, the district court stated:

> The deceptive practices by [Dale] that set the wheels in motion leading to his state of affairs should not be ignored or rewarded by the Court.
>
> An issue that should be addressed and permeates this case is the unclean hands and bad faith of [Dale]. [He] originally placed his land in the first of three trusts, the object of each trust to avoid paying taxes, avoid creditors, specifically a [$38,000 judgment] and to receive the benefit of a rent free home despite his children being the beneficiaries. He acquiesced in [Wells'] doing whatever was necessary to achieve the above goals of the trust. As pointed out in the SLS brief, both [Wells and Dale and Carol] admit that part of the reason Tract 1 was sold to SLS was to pay the personal judgment against [Dale]. The Hugh Ralston Estate was pursuing the trust alleging a fraudulent conveyance had been made into it. [Dale] was not a beneficiary of the trust. [Dale and Carol] knew about or participated in various activities involving the trust transactions for approximately seven years. [Dale] comes into a Court of equity with unclean hands and that he should not profit now that his schemes of avoiding creditors, taxation and investing in fraudulent investments have failed. [Dale] was the primary player among the [Appellants]. Because of his actions the other [Appellants] also have no right to benefit from his actions.

Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy in issue. *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012). Generally, conduct which forms a basis for a finding of unclean hands must be willful in nature and be considered fraudulent, illegal, or unconscionable. *Id.*

As was true in connection with the discussion of the claims against SLS and Joel and Elwyn, the court's decision regarding Dale's unclean hands amounts to an ultimate resolution of the disputed facts. Viewing the evidence in the light most favorable to the Appellants, there is evidence in the record that suggests that Dale did not learn about the transfer of the trust assets into Picibo Company and Aebeskiver until after their occurrence, that the property was conveyed to Mill Creek before Dale owed rent on the Ralston land, and that Wells acted on his own in wiring the money from the 2007 sale of Tract 1 to Texas for investment on a medical device without the knowledge and approval of Dale.

We conclude that the district court was in error in deciding the ultimate question of fact regarding Dale's alleged unclean hands as justification for entry of summary judgments in favor of SLS and Joel and Elwyn. See *Young v. Govier & Milone*, 286 Neb. 224, 835 N.W.2d 684 (2013).

*Failure to Grant Summary Judgment*
*in Favor of the Appellants.*

Because there are genuine issues of material fact as outlined above, we find no error in the failure of the district court to grant the Appellants' motion for summary judgment.

## CONCLUSION

The district court erred in granting summary judgment against the Appellants in favor of SLS and Joel and Elwyn.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.